# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICTOF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **DAVID GILLESPIE,** | § | |
| **Individually and on Behalf of all Others** | § | |
| **Similarly Situated,** | § | **CIVIL ACTION NO.** 4:18-cv-01405 |
| | § | |
| *Plaintiffs,* | § | |
| **v.** | § | |
| | § | |
| **STATOIL TEXAS ONSHORE** | § | |
| **PROPERTIES, LLC,** | § | |
| **STATOIL PIPELINES, LLC,** | § | **JURY TRIAL DEMANDED** |
| **STATOIL USA ONSHORE** | § | |
| **PROPERTIES, INC., and** | § | |
| **STATOIL GULF SERVICES, LLC** | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT

David Gillespie, (hereinafter also "Plaintiff") by and through his undersigned counsel, on behalf of himself and all others similarly situated, allege facts and claims upon his personal knowledge as to matters relating to himself, and upon information and belief as to all other matters based upon the investigation of counsel, as follows:

## I. INTRODUCTION

1.    This action is brought to remedy the systemic breach of contract by StatOil Texas Onshore Properties, LLC, StatOil Pipelines, LLC, Statoil USA Onshore Properties, Inc., and StatOil Gulf Services, LLC (hereinafter collectively "StatOil" and/or Defendants) in connection with StatOil's use of an improper methodology to calculate and pay Plaintiff and Class Members contractually owed oil and gas royalties.  In 2010, Talisman Energy USA, Inc. ("Talisman") and StatOil Texas Onshore Properties, LLC entered a joint development agreement to own and

produce oil and gas from multiple wells and leases across the Eagle Ford, Texas area.  Under the joint development agreement, StatOil and Talisman divided the oil and gas production on a roughly 50-50 basis.  StatOil and Talisman sold their own shares of production and each paid royalty owners for their share of the production sold.

2.      Starting in 2009, the Eagle Ford saw a remarkable rise in new rigs and new production.[1] Effective August of 2013, StatOil assumed the position of authorized operator for wells in the eastern area of operations which covered principally Karnes, DeWitt and Bee counties.  Effective April 2016, StatOil assumed the position of authorized operator for all joint wells in all Eagle Ford areas.

3.      StatOil lacked adequate "condensate" production data and/or other data, and therefore improperly calculated payments due Plaintiff and others similarly situated.  Much of the Eagle Ford shale production is light and unstable "condensate," which must be stabilized before the product is marketable.   "Condensate" refers to a lighter grade of crude oil, often produce in conjunction with wells that produce large amounts of natural gas.  Stabilization requires treatment, usually in the form of heating and pressurization, to remove the volatile and lighter elements—principally methane and other natural gas liquids.  These lighter elements, known as "flash gas," can be collected and reintroduced back into the natural gas stream for subsequent processing and sale.  Many times, removal of "flash gas" results in 30% or more of the initial condensate volume measured at the well separator to shrink into the final stabilized volume suitable for sale.  StatOil and its joint venture, Talisman, constructed over a dozen different batteries or central facilities sometimes referred to as Central Delivery Points ("CDP's) or Central Receipt Points ("CRP's") to perform this necessary processing.

---

[1] *See* https://www.eia.gov/petroleum/drilling/pdf/eagleford.pdf

4.      Initial processing occurs at the separator near the well where the raw stream is split into water, oil, condensate, and gas.  The oil/condensate and gas are measured at a meter installed at the tail-end of the separator.  Additional processing occurs between this point of measurement and measurement at the point of sale.  Between that processing and natural evaporation of condensate/oil, there is typically a reduced volume measured at the sales meter, with the difference referred to as "shrinkage."  Because the final measurement point is at the sales meter, the accounting function must proportionally allocate production back to the wells for the purpose of properly calculating royalty.  In many cases, 20%, 30%, or more of the initial condensate volume is shrunk as a result of treatment.

5.      StatOil's lack of a proper methodology (due to a lack of condensate production data) resulted in both it and Talisman improperly calculating payments due royalty owners including, inter alia, Plaintiff David Gillespie.

## II. PARTIES

6.      Plaintiff David Gillespie is a citizen of Texas and resident of Bexar County, Texas.  Mr. Gillespie owns lease interests entitling him to royalty payments on the actual oil and gas produced from wells operated by StatOil and/or Talisman.  Plaintiff Gillespie entered into an oil and gas lease agreement with StatOil and/or Talisman for the development, production, and sale of oil and gas in Texas.  Since that time, Plaintiff Gillespie has been underpaid royalties as a result of the improper payment methodology employed by StatOil.

7.      StatOil Texas Onshore Properties, LLC ("StatOil Texas"), upon information and belief, is and has been at all times material and relevant herein, a for-profit corporation organized and existing under the laws of the State of Delaware with its principle place of business in Houston, Texas.  Defendant StatOil USA may be served with process through its registered agent, Capitol

Corporate Services, Inc., 206 E. 9th Street, Suite 1300, Austin, Texas 78701. Plaintiff has requested a waiver of summons from this Defendant.

8.    StatOil Pipelines, LLC ("StatOil Pipelines"), upon information and belief, is and has been at all times material and relevant herein, a for-profit corporation organized and existing under the laws of the State of Delaware with its principle place of business in Houston, Texas. Defendant StatOil USA may be served with process through its registered agent, Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701. Plaintiff has requested a waiver of summons from this Defendant.

9.    StatOil USA Onshore Properties, Inc. ("StatOil USA"), upon information and belief, is and has been at all times material and relevant herein, a for-profit corporation organized and existing under the laws of the State of Delaware with its principle place of business in Houston, Texas. Defendant StatOil USA may be served with process through its registered agent, Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701. Plaintiff has requested a waiver of summons from this Defendant.

10.    StatOil Gulf Services, LLC ("StatOil Gulf"), upon information and belief, is and has been at all times material and relevant herein, a foreign limited liability corporation conducting business in the State of Texas. Defendant StatOil Gulf may be served with process through its registered agent, Corporation Service Company, as reflected in the Texas Secretary of State records, at 211 E. 7th Street, Suite 620 Austin, Texas 78701-3218. Plaintiff has requested a waiver of summons from this Defendant.

### III. JURISDICTION

11.    This Court has jurisdiction over Plaintiff's claims pursuant to Title 28 U.S.C. §1332(d). Diversity jurisdiction exists and Plaintiff resides in Texas. The Class consists of citizens and

residents having oil and gas rights for property including leases involving StatOil. The amount in controversy exceeds $5,000,000.00 for Representative Plaintiffs and members of the Class collectively, exclusive of interests and costs, by virtue of the amount of royalties StatOil failed to pay pursuant to its contractual obligations, and by virtue of the declaratory relief sought.

## IV. VENUE

12.    Venue is proper in the Southern District of Texas, Houston Division, where Plaintiff's wells at issue are located and Plaintiff Gillespie, along with certain of Class Members, reside. Venue is proper in this district pursuant to Title 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this federal district.

## V. FACTS

13.    Plaintiff and Class Members own royalty rights and interests arising from oil and gas leases in the South Texas Eagle Ford shale play ("Eagle Ford"). These royalty interest owners include individuals, partnerships, trusts, corporations and other entities residing both in Texas, and throughout the United States that own leases in the Eagle Ford. Statoil was established as a wholly-state owned oil company in 1972. Reform in 1985 made it possible to consider the ownership structure of StatOil and apply for public listing. This reform marked the start of a process leading up to the public listing of StatOil in 2001. Norsk Hydro ASA ("Hydro") was founded in 1905 as a private company. Hydro-electric development at the beginning of the 20th century laid the basis for industrial growth in Norway and for Hydro's business concept, which was the production of nitrogen fertilizer. Hydro entered the oil and gas industry in 1963, and in October of 2007, merged with StatOil. Today, StatOil is a Norwegian-based energy company with operations in more than thirty (30) countries.

14.    Talisman is an upstream oil and gas production company and an indirect subsidiary of Calgary, Alberta-based Talisman Energy Inc., ("TEI") which was acquired for approximately $13 billion by an affiliate of the Spanish integrated energy company Repsol S.A. on May 8, 2015.  In 2010, Talisman and StatOil entered a joint development agreement to own and produce oil and gas from multiple wells and leases across the Eagle Ford, Texas area.  Under the joint development agreement, StatOil and Talisman divided the oil and gas production on a roughly 50-50 basis. StatOil actually identifies the Eagle Ford play on its website.  StatOil and Talisman sold their own shares of production and each paid royalty owners for their share of the production sold.  By entering into a joint venture, StatOil became jointly and severally liable for payments made to royalty owners.

15.    In Texas, gas and oil leases permit royalty payments to be calculated based on the amount of gas or oil as determined either at the wellhead or the amount that enters the pipeline for sale and may be based on production of oil and gas, or sales of the produced oil and gas.

16.    The production of oil, condensate and natural gas at a well site is measured daily at the wellhead by a meter.

17.    Pursuant to Texas oil and gas law, the operating entity is responsible for reporting all required well production data to Texas Comptroller of Public Accounts (hereinafter "Texas Comptroller").  Title 16, TEX. NAT. RES. CODE.  Reports to the Texas Comptroller include both volumes sold and revenues received, by product reported.

18.    Texas law also requires that any entity paying oil and gas royalties must accompany the payment with a check stub from the payor containing details, inter alia, of well identification, volume of production, price, decimal interest (the royalty owner's share of production from the drilling unit), expense deductions and taxes. TEX. NAT. RES. CODE §§91.501-91.502. The required

check stub detail is intended to allow the royalty recipient to verify that the payment accords with the payor's obligation under applicable leases.

19.    In 2010, Talisman entered the Texas oil and gas market and opened a Texas office whereby it acquired extraction rights under numerous oil and gas leases in the Eagle Ford shale including those owned by Plaintiff and the Class Members. Talisman also entered into the South Texas Joint Development Agreement (the "Development Agreement"), which created a joint venture between Talisman and Statoil to explore, develop and produce oil and gas.  Statoil also owns extraction rights under numerous oil and gas leases in the Eagle Ford.

20.    The Development Agreement obligated the well operator, including StatOil, to report all well production data to the non-operating partner in a manner consistent with and as required by the Texas Comptroller, so that both the operator and non-operating partner could comply with Texas law governing royalty payments, expenses, adjustments and deductions thereto and documentation including check stubs to mineral rights owners.

21.    Under the Development Agreement, StatOil and Talisman agreed to divide the oil and gas production on a 50-50 basis.   StatOil and Talisman sell their own share of the production, are required to properly report their half of the volumes to royalty owners, and must properly pay royalty owners.

22.    Plaintiff and Class Members are owners of the royalty rights for oil and gas leases in Eagle Ford that establish their rights to properly calculated royalty payments. The Development Agreement did not change Plaintiff's or Class Members' rights to proper royalty payments.

23.    Initially, Talisman acted as operator for all of the Eagle Ford joint venture acreage, with Statoil retaining a non-operating   working interest.   While the operator of record, StatOil and/or

Talisman were responsible for accurately reporting the oil and gas production to the Texas Rail Road Commission and state Comptroller.

24.     While the operator and/or joint venture partner with Statoil, Talisman began in late 2012 to commingle the gross production of oil, condensate and gas from various wells of differing ownership, including Plaintiff's wells, using extensive gathering and treatment facilities referred to as Central Gathering Points, Central Deliver Points and/or Central Receipt Points.

25.     StatOil's joint venturer, Talisman, has admitted that when it entered the Texas oil and gas market, it did not have the capability to manage the complexities of the leases it was purchasing and entering into and its production accounting system was incapable of proper allocation of commingled oil and gas production and sales.

26.     Effective July 1, 2013, StatOil and Talisman modified their Joint Development Agreement so as to divide responsibility for drilling and operating wells in the joint venture acreage, including those in which Plaintiff and Class Members owned royalty interests.

27.     According to the Joint Development Agreement modification effective July 1, 2013, Talisman continued operating wells within the western and central portion of the shared holdings, and StatOil agreed to operate the wells in the eastern portion of the shared acreage.  However, Talisman continues to market its own share of production and maintain a revenue accounting function to account for the revenues received from sales of production  and allocate revenues back to each owner on a per-well basis.

28.     In December of 2015, StatOil and Talisman further amended the Joint Development Agreement to provide that Statoil now serves as operator for all wells within the joint venture acreage, with Talisman retaining a non-operating working interest.

29.    Unbeknownst to Plaintiff and Class Members, StatOil and Talisman's joint decision to commingle gross oil and gas production from wells of differing ownership interest created certain challenges when allocating the commingled sales of those production volumes back to the individual wells. Texas law requires that a "commingler" identify each royalty owner's aliquot share of production commingled and sold with reasonable certainty.  StatOil and its joint venturer, Talisman, did not properly allocate these commingled sales of those production volumes.

30.    In addition to their commingling and allocation problems, StatOil and Talisman jointly reduced the measured volumes of gas and oil by an across-the-board skim (the "Skim").  StatOil and Talisman used gross production volumes of condensate reduced by as much as 30% to estimate net sales of condensate   then improperly   allocated those volumes back to the individual wells before improperly paying royalty owners, like Plaintiff, on the improperly shrunken volumes.

31.    The issues with joint venturer StatOil's and Talisman's commingling, allocating and shrinking were not clear to or discoverable by Plaintiff or royalty owners. While the Joint Development Agreement required StatOil and Talisman to share production and pay royalties  on a 50-50 basis, the information and format of Talisman's check stubs were different from the information  and format of Statoil's check stubs and for production and production adjustments during  different  time  periods  than  those reflected on check stubs, it was difficult,  if not impossible,  for Plaintiff and Class Members to determine the net difference, let alone the reason for the net difference,  in royalty  payments.

32.    StatOil's joint venture, Talisman, has admitted to reducing Plaintiff's and Class Members' royalty payments based on "shrinkage."  Talisman has also admitted that if it could not justify its lower production volume, so both StatOil and Talisman, via joint venture, would be legally

responsible to make additional royalty payments to royalty owners pursuant to their respective lease agreements.

33.    In response to royalty owner's questions regarding the difference in the royalty payments between Talisman and Statoil, Talisman explained away the Skim by contending that in transporting and marketing oil, certain volumes of condensate (light oil) do not qualify for royalty payments because they are lost to "shrinkage."

34.    In the oil and gas industry, shrinkage refers to the difference between production amounts produced at the wellhead entering a pipeline for sale.  Shrinkage attributable to a given well is not a static percentage.  There is no domestic oil industry standard or common practice which allows for application   of a fixed shrinkage factor to estimate sales.   Moreover, based upon information and belief, StatOil's joint venturer, Talisman's own personnel, concluded shrinkage, if applicable, could never approach the 20% Skim, and certainly never 30%.

35.    Any reduction of royalty payments under a mineral rights lease must be permitted and justified, either from actual measurement or established American domestic oil industry standards. Plaintiff's and Class Members' materially similar lease provisions require   joint venturers StatOil and Talisman   to pay on actual   sales not estimated, commingled, allocated, shrunken   or calculated net sales volumes as done here.

36.    Regardless whether the production volume is measured   at the well head, after separation, or at the point of sale, under no circumstances do the applicable leases permit the aforementioned Skim.

37.     In employing the Skim for the purpose of shorting royalty payments to Plaintiff and Class Members, StatOil and its joint venturer Talisman engaged in actions that were arbitrary, capricious, and in bad faith.

38.     StatOil and its joint venturer Talisman has    also arbitrarily manipulated production volumes and royalty payments from joint venture wells operated by Talisman and reported shrunken and improperly allocated net sales volumes to the Texas Rail Road Commission and State Comptroller.

39.     Complaints were made about the discrepancies between royalty checks from StatOil and Talisman, but only misleading explanations were provided.

## VI. EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

40.     StatOil and its joint venturer Talisman arbitrarily and unilaterally manipulated royalty owner payments by estimating sales volumes through the shrinking of gross production volumes and improperly allocating commingled production and net sales volumes.

41.     StatOil and its joint venturer Talisman intentionally concealed the actions herein described in the forgoing paragraphs to ensure the continuation of those activities and forestall legal action.

42.     Without access to the Joint Development Agreement, well production, run sheets and gauge reports, and StatOil's and Talisman's sale and distribution agreements, Plaintiff and Class members alike would be both unable to determine the extent and nature of StatOil's   and its joint venturer Talisman's wrongful conduct or the financial harm suffered because of such conduct. None of these documents critical to exposing StatOil's and its joint venturer Talisman's   wrongful conduct were given to Plaintiff or Class Members.   Thus, Plaintiff   and Class Members were left inadequate information. Moreover, Statoil and Talisman did not simply disclose its commingling,

allocating and estimating to Plaintiff and Class Members. Moreover, StatOil and Talisman concealed or obfuscated such information such that neither Plaintiff nor Class Members could reasonably ascertain the issues discussed herein.

43.    By its very nature, StatOil's  and its joint venturer Talisman's activity, as alleged herein, was self-concealing. Plaintiffs had no knowledge of StatOil's   and its joint venturer Talisman's deceitful conduct and could not have discovered same by the exercise of due diligence.

44.    As a result of StatOil's  and its joint venturer Talisman's fraudulent  concealment  of its conduct, and the self- concealing  nature of their acts, Plaintiff asserts the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiff and Class Members.

45.    StatOil is equitably estopped from asserting that any otherwise applicable limitations period has run.

## VII. THE DISCOVERY RULE

46.    Plaintiff did not discover, nor should Plaintiff have reasonably discovered, StatOil's  and its joint venturer Talisman's wrongful conduct causing their injuries until recently, prior to the filing of this complaint.

47.    Plaintiff did not discover, nor should Plaintiff reasonably have discovered, (1) the injuries and (2) the identity of the person(s) whose wrongful conduct caused the injuries, until recently, prior to the filing of this complaint.

48.    The discovery rule applies to toll the statute of limitations as to all causes of action against StatOil and its joint venturer Talisman, and other responsible parties identified by discovery in this matter.

## VIII. CLASS ACTION ALLEGATIONS

49.    This action asserts claims on behalf of a class pursuant to Federal Rules of Civil Procedure

23(a), (b)(l), (b)(2), (b)(3), and (c)(4) as follows:

> All persons who, pursuant to an oil and gas lease within the Texas, Eagle
> Ford Shale, received between January 1, 2010 and May 4, 2018 royalty payments
> from StatOil and/or its joint venturer Talisman attributable to production, including
> but not limited to, gas, oil, condensate and all hydrocarbons separated,
> extracted or manufactured from gas that was commingled with production from
> one or more other wells, and to whom StatOil and/or its joint venturer Talisman
> paid such royalties using a volumetric allocation methodology of net production
> sold and/or estimated "shrunk" production volumes.

50.    Excluded from the Class are (i) StatOil and its employees, principals, affiliated entities,

legal representatives, successors and assigns; and (ii) the judges to whom this action is assigned,

any members of their immediate families, (iii) and any clerk or staff assigned to those judges.

51.    There are thousands of potential members of the Class who are geographically dispersed

throughout the United States. Therefore, individual joinder of all members of the Class would be

impractical.

52.    There is a well-defined community of interest in the questions of law and fact affecting the

parties represented in this action.

53.    Common questions of law or fact exist as to all members of the Class. These questions

predominate over the questions affecting only individual Class members. The predominate legal

and factual questions in this case include, but are not limited to:

> a.    Whether the Skim Scheme methodology was applied to Plaintiff and all Class
>      Members alike, and whether that Skim Scheme's methodology reduced
>      royalty payments due Plaintiff and all Class Members.
>
> b.    Whether StatOil and/or its joint venturer Talisman voluntarily commingled
>      the gross oil and gas production of multiple wells with differing ownership
>      interests;

b.   Whether StatOil and/or its joint venturer Talisman can identify with reasonable certainty each royalty owner's aliquot share of gross production and resulting net sales;

c.   Whether StatOil and/or its joint venturer Talisman improperly  allocated net sales back to the individual wells in violation of industry standards and common practice:

d.   Whether  StatOil and/or its joint venturer Talisman  used an industry accepted  standard or practice  when they estimated  nets sales of condensate by use of a common  methodology  to arbitrarily reduce production volumes of oil and gas;

e.   Whether StatOil's and/or its joint venturer Talisman's application of a 20%-30% Skim in calculating royalties to Class Members was justified, either from actual measurement or established American domestic oil industry standards;

f.   Whether StatOil and/or its joint venturer Talisman breached the materially similar lease provisions of Plaintiff and Class Member regarding the volumes for which royalty payments are made;

g.   Whether the commingling, allocating and arbitrary shrinking of production volumes of oil and gas resulted in reduced royalty payments to Plaintiff and Class Members;

h.   Whether StatOil and/or its joint venturer Talisman disclosed, accounted for and reported correctly to Plaintiff and Class Members the volumes of oil and gas production   on which it owed royalties;

1.   Whether StatOil's and/or its joint venturer Talisman's commingling gross production, allocating net sales and use of the Skim violated its duties to Plaintiff and Class Members to honestly account for and pay royalties;

J.   Whether the check stubs furnished by StatOil and/or its joint venturer Talisman with royalty payments complied with Texas law; and

k.   The appropriate measure of damages, penalties, interest, equitable and/or declaratory relief.

54.   The Skim Scheme methodology applied to Plaintiff and all Class Members alike.  The Skim

Scheme's calculation is one of a simple methodology that applies an across-the-board number to

Plaintiff and all Class Members.  Under well settled law, variances in the amount of damages of individual class members do not preclude class certification.

55.    Plaintiff's claims are typical claims of the Class in that Plaintiff has materially similar lease agreements as other members of the class entitling them to royalty payments from the gross production volume sold. Plaintiff's claims are also not subject to any unique defenses. Therefore, there are no significant differences in any relevant respect from any other Class member, and the relief sought is common to the Class.

56.    Plaintiff is an adequate representative of the Class because he has no interests adverse to or in conflict with members of the Class he seeks to represent, and he has retained counsel competent and experienced in conducting complex class action litigation, and litigation regarding the rights of mineral owners. Plaintiff and his counsel will adequately protect the interests of the Class.

57.    StatOil and its joint venturer Talisman have engaged in a pattern of misconduct common to the entire Class so that class-wide relief is appropriate.

58.    The common  pattern  of StatOil's and joint venturer Talisman's  misconduct  and the common  theories  for redressing that misconduct make a class action superior to other available methods for fairly and efficiently adjudicating  the underlying  dispute.  The damages suffered by each individual Class Member  on balance   are relatively  small, while the burden  and monetary  expense  needed to individually  prosecute  this case against StatOil is substantial. Thus, it would be virtually impossible  for Class Members  individually  to redress  effectively the wrongs  done to them. Moreover, even if Class Members could afford individual actions, a multitude of such individual actions still would not be preferable to class-wide litigation.

59.     By contrast, a class action presents far fewer litigation management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive  supervision by a single court.  The class is readily definable and prosecution  as a class action will eliminate the possibility of repetitious  litigation while also providing redress for those claims that may be too small to warrant the expenses of individual, complex litigation.  Also, or in the alternative, the Class may be certified because  StatOil  has acted or refused  to act on grounds  generally applicable to the Class, thereby making preliminary and final declaratory relief appropriate.

60.     In addition, the maintenance  of separate actions  would  place  a substantial  and unnecessary  burden  on the courts  and could result  in inconsistent  adjudications,  which  would be dispositive  of at least some of the issues and hence interests  of the other members  not party to the individual  actions,  would substantially  impair or impede  their ability to protect their interests,  and would establish  incompatible  standards  of conduct for the party opposing the Class.  A class action can determine   the legality of Defendants'    actions relative to all class members   with judicial economy.

61.     Further, in the alternative, the Class may be maintained   as a class action with respect to particular issues pursuant to FED.R.CIV.P. 23(c)(4).

62.     All records concerning each of the leases, volumes of gas and oil production, and royalty payments from StatOil are in the possession and control of StatOil and its agents and are available through discovery.

## IX. CLAIMS
### COUNT 1
### BREACH OF
### CONTRACT

63.     Plaintiff incorporates by reference all preceding paragraphs.

64.    Plaintiff and Class Members executed valid and enforceable contracts in the form of oil and gas leases, directly or through assignments, with StatOil.

65.    Plaintiff, as party to the lease and assignments, is the proper party to enforce the terms of the relevant leases and assignments and has performed, or has substantially performed, all necessary conditions precedent, dependent obligations, and/or dependent covenants owed under the relevant leases and assignments.

66.    Pursuant to the materially similar terms of Plaintiff's and Class Members' applicable oil and gas leases, StatOil promised to make royalty payments based on the actual production volume of gas and oil sold.

67.    Plaintiff and Class Members are, and have been, entitled to StatOil's performance of its obligations under the relevant leases and assignments to make royalty payments based on the actual production volume of gas and oil sold.

68.    StatOil materially breached the gas and oil leases applicable to Plaintiff and Class Members by paying royalty owners based on estimated production volumes sold as a result of StatOil improperly allocating net sales from commingled production and applying the Skim to gross production volumes and thereby reducing the royalty payments owed to Plaintiff and Class Members.

69.    StatOil has refused and continues to refuse to perform its obligations to pay Plaintiff and Class Members royalty payments based on the actual production volumes of gas and oil sold as required by the applicable lease agreements.

70.    As of the filing of this Complaint Statoil has not tendered the amounts owed to Plaintiff or Class Members.

71.    Defendants have materially breached its contractual obligations to Plaintiff and Class Members, including the express terms set out above in the Facts. Examples of such breaches include but are not limited to the following:

a.    Through the Skim Scheme, reducing production volumes of oil, or liquid or liquefiable hydrocarbons and/or natural gas produced from the relevant lands by approximately 20% - 30% without notice or contract support under the existing oil and gas lease contracts;

b.    Failing to pay the agreed royalty payments for oil or liquid or liquefiable hydrocarbons produced and sold from the relevant lands as provided for in their oil and gas lease;

c.    Failing to pay royalties on all oil, condensate and gas produced and sold from the relevant lands as provided for in their oil and gas lease; and

d.    Refusing to provide Plaintiffs, among other materials, relevant and related records and data pertaining to the production, transportation, sale, and marketing of the production from the relevant lands.

72.    As a direct and proximate cause of StatOil's contractual breaches, Plaintiff and Class Members have been damaged for which they are entitled to recover actual damages, consequential damages, interest, penalties, attorneys' fees, and any other legal or equitable relief deemed appropriate by the Court.

## COUNT 2
## ACCOUNTING

73.    Plaintiff incorporates by reference all preceding paragraphs.

74.    Damages alone will not compensate Plaintiff and Class Members for their collective loss of royalty payments consistent with their oil and gas lease contracts. The facts and accounts presented are so complex that adequate relief may not be obtained at law. Standard discovery procedures, such as requests for production, interrogatories, and subpoenas *duces tecum,* may

prove inadequate to provide Plaintiff and Class Members with the information sought regarding royalty payments.

75.     Plaintiff and Class Members seek an accounting pursuant to the information required under Texas Natural Resources Code Section 91, *et seq.* as follows:

   a.  For past and present monthly production volumes of oil, liquids, condensate, liquefied hydrocarbons and natural gas by well for Plaintiff and Class Members as reported to the Texas Comptroller or other state or federal agency, to royalty owners by StatOil, as recorded by any third-party vendor contracted by StatOil to test, sample or record such volumes;

   b.  For past and present royalty payments made to Plaintiff and Class Members on the production of oil, liquids, condensate, liquefied hydrocarbons and natural gas production volumes, and substances; and

   c.  For past and present deductions by category of expense or other deductions including but not limited to deductions for "shrinkage," and for past and present information supporting any deduction or expense from or to production volumes or royalty payments.

### COUNT 3
### <u>UNJUST</u>
### <u>ENRICHMENT</u>

76.     Plaintiff incorporates by reference all preceding paragraphs. This Count is brought in the alternative.

77.     StatOil has been unjustly enriched because of the Skim Scheme, commingling, improperly allocating, shrinking and underpayment of royalties owed to Plaintiffs and Class Members as described herein.

78.      Plaintiff and Class Members, in justice and fairness, are entitled to restitution of all underpayments of royalties caused by such wrongful acts and omissions which unjustly enriched StatOil, recovery of reasonable attorneys' fees, recovery of statutory penalties and interest as provided at Tex.Nat.Res. Code §§91.401 ~ 91.404, punitive damages and any and all other equitable relief deemed appropriate by the court.

**COUNT 4**
**DECLARATORY**
**JUDGMENT**

79.     Plaintiff incorporates by reference all preceding paragraphs.

80.     Plaintiff and Class Members are entitled to a declaratory judgment: (a) declaring StatOil

liable to Plaintiff and Class Members for the wrongful acts, omissions, practices, and schemes

described above, (b) ordering StatOil to provide complete and accurate check stub information, as

required by TEX.NAT.RES. CODE §91.502, (c) granting Plaintiff and Class Members such other or

additional declaratory and/or injunctive relief relating to such wrongful acts, omissions, practices,

and financial/accounting schemes as may be available under the law and deemed appropriate   by

the Court, and/or (f) awarding attorneys' fees as provided for by contract or pursuant to

TEX.NAT.RES. CODE §91.406, and TEX.CIV.PRAC. & REM. CODE 38.001 *et seq.*

**X. REQUEST FOR RELIEFAND PRAYER**

81.      WHEREFORE, Plaintiff, on behalf of himself and on behalf of all other Class Members,

request an award and relief as follows:

   a.  An order certifying that this action is properly brought and may be maintained as a
       class action, that Plaintiff be appointed Class Representative, and undersigned
       counsel be appointed Class Counsel;

   b.  A determination that StatOil breached obligations owed to Plaintiff and Class
       Members;

   c.  A declaration and Order providing the other declaratory and injunctive relief
       requested throughout this Complaint;

   d.  An Order requiring StatOil to provide an accounting of past and present royalty
       payments for Plaintiff and Class Members;

   e.  Actual and consequential damages in an amount to be determined at trial;

   f.  Applicable statutory penalties for Claims for which they are available;

   g.  Punitive damages for Claims for which they are available;

h.  Equitable and/or declaratory relief for Claims for which they are available;

i.  An order awarding Plaintiffs their costs of suit, including reasonable attorneys' fees and pre-and post-judgment interest at the highest rate allowed by law;

j.  An order declaring that StatOil is financially responsible for notifying all Class Members of this action; and

k.  Such other and further relief as may be deemed necessary or appropriate.

## XI.  DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully Submitted,

**THE FERGUSON LAW FIRM, LLP**
350 Pine Street, Suite1440
Beaumont, Texas 77701
Tel: 409.832.9700
Fax: 409.832.9708

By:  **/s/ Jane S. Leger**
       Jane S. Leger
State Bar No. 00788814
jleger@thefergusonlawfirm.com
By:  **/s/ Paul "Chip" Ferguson**
       Paul "Chip" Ferguson
State Bar No. 06919200
cferguson@thefergusonlawfirm.com
By:  **/s/ Mark C. Sparks**
       Mark C. Sparks
State Bar No. 24000273
mark@thefergusonlawfirm.com

AND

By:  **/s/ Layne Walker**
       Layne Walker
State Bar No. 20713900
Walkerlaw3@gmail.com